## Martin K. Duncan, Appellant, v. J. Ed. Dazey, Appellee.

1. ACCOUNT, §§ 43, 44*—*when defenses not preserved for consideration in bill for accounting.* The defenses of laches, of the statute of limitations and statute of frauds were not preserved for consideration in a bill to state an accounting, where the master made no findings of law or fact upon such defenses, and defendant filed no objections to the master's report.

2. FRAUDULENT CONVEYANCES, § 155*—*when fraudulent conveyance valid between parties.* A voluntary conveyance of land in fraud of creditors, while void as to creditors, is binding upon the parties as far as it is executed, but neither law nor equity will lend its aid to complete any part of the transaction.

3. TORTS, § 22*—*when persons not in pari delicto.* In cases where both parties are *in delicto*, concerning an illegal act, it does not always follow that they stand *in pari delicto*, for there may be,

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.
Vol. CCXIV 16

and often are, different degrees in their guilt, as one party may act under circumstances of oppression, impression, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense.

4. ATTORNEY AND CLIENT, § 94*—*when not in pari delicto in matter of fraudulent conveyance.* The parties to a bill for accounting were not *in pari delicto*, although the evidence showed beyond reasonable doubt that the acts of complainant, in the transactions involved, were for the purpose of concealing his property so that it would not be subjected to the claim of a creditor, where defendant, a supposedly intelligent business man, who was also a licensed attorney, controlling the only bank in a small town and thereby holding himself out as one entirely worthy of confidence and trust, assisted and encouraged the illiterate and ignorant complainant to convey to him a farm worth at least $13,000 above the mortgage, and other property, and to abandon his home and family in order to defeat a claim of a little over $1,000, and aided in the commission of a fraud upon complainant's wife by executing a bond for reconveyance, thereby inducing her to execute a deed under the false belief that he would hold the title but temporarily.

5. ATTORNEY AND CLIENT, § 94*—*when not in pari delicto in matter of fraudulent conveyance.* The parties to a bill for accounting were not *in pari delicto* although the acts of complainant, in the transactions involved, were for the purpose of evading a creditor's claim, where complainant was ignorant and illiterate, and defendant was a banker and licensed attorney and stood in confidential relations to complainant and exercised an extraordinary influence over him, and where complainant believed that the creditor's claim was one which he did not morally nor lawfully owe and that its attempted collection was a scheme to deprive him of his property.

6. EQUITY, § 66*—*when party in delicto entitled to relief.* If parties *in delicto* are not *in pari delicto*, equity will give relief to the one that is comparatively innocent.

Appeal from the Circuit Court of Shelby county; the Hon. JAMES C. McBRIDE, Judge, presiding. Heard in this court at the April term, 1918. Reversed and remanded with directions. Opinion filed April 29, 1919. Rehearing denied July 9, 1919.

**Statement by the Court.** Martin K. Duncan, appellant, on October 16, 1915, in the Circuit Court of Shelby county, filed his bill in equity to procure an

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

accounting with J. Ed. Dazey, appellee. The bill was amended and alleged in substance as follows:

That Martin K. Duncan, the complainant, was on September 22, 1903, and long prior thereto, the owner in fee of 180 acres of land in Shelby county, Illinois, described as follows: "East Half of Southeast Quarter, and Southeast Quarter of Northeast Quarter of Section 16, and the East 60 acres of Northwest Quarter of Sec. 21, Twp. 12 N. R. 4 E.; incumbered to the amount of $4,000.00, and worth over and above such incumbrance the sum of $18,500.00."

That on September 22, 1903, and for many years prior thereto, Duncan had been intimately acquainted with defendant, J. Ed. Dazey, who was then, and had been for many years prior thereto, engaged in the banking business, and conducting large business interests in and around Findlay, Illinois; that Duncan had for many years been a patron of Dazey in his banking business, and had had large dealings with him in connection with other matters; that Duncan is a man of limited business experience and judgment, and for many years prior to September 22, 1903, had looked to Dazey for business advice and counsel, and had followed Dazey's advice in the conduct of his affairs, and had at all times looked to Dazey as a man of wide business experience and capacity and unquestioned business integrity; that he had been advised by Dazey in many business transactions, and had depended upon such advice, and that Dazey had always dealt fairly and honorably with Duncan and was at all times honest and square with him; and that there had grown up between the two a fiduciary relationship in which Duncan had implicit trust and confidence in the business advice of Dazey.

That among other things upon which Duncan counseled and consulted with Dazey was the matter of divorce proceedings with his, Duncan's, first wife, in settlement of property rights in connection with which

Duncan's wife took certain real estate which was incumbered by mortgage, she assuming and agreeing to pay the debt secured thereby, such debt being the joint obligation of Duncan and his wife; that she failed to keep her agreement to pay said debt, as a result of which, foreclosure proceedings were had on said property at the November, 1897, term of Circuit Court of Shelby county; that the property lacked $1,130.40 'of satisfying the debt upon foreclosure sale, but no deficiency judgment was then or at any other time taken therein; that Duncan was counseling with Dazey with regard to his business at the time this deficit developed, and Dazey advised Duncan that he, Duncan, was not bound for said deficit; that it was an unjust debt, and that Duncan ought not to be required to pay it, which advice was accepted and followed by Duncan.

That about August 18, 1903, suit was instituted in said Circuit Court by one Laura A. Graybill against Duncan upon one of the notes involved in said foreclosure proceeding; that upon September 22, 1903, Dazey came to the home of Duncan and told Duncan that he, Dazey, had been to Shelbyville and while there had learned of the bringing of the Graybill suit, the same being the first information reaching Duncan regarding such suit; that Dazey then further stated to Duncan that they were about to ruin Duncan, and that he, Duncan, should transfer all his property to Dazey and Duncan's son, M. Aubrey Duncan; that Duncan should at once leave the State to avoid service of process in such suit; that Dazey stated the amount claimed in said Graybill suit was $3,300, although as a matter of fact such suit was for but $1,130.40, exclusive of interest.

That at such time, September 22, 1903, Dazey formed the design to defraud Duncan out of all or a large part of his property, and took the said Graybill suit as a starting point for such design; that Duncan at that time had no knowledge of such design and no reason for suspecting such until the summer of 1915;

that continuously up until the summer of 1915, Duncan had complete confidence and trust in Dazey and followed his advice in business affairs; that at such time, September 22, 1903, Duncan had no adviser other than Dazey, or such lawyers as Dazey might employ, was ignorant in such matters except as he was advised by Dazey and accepted and relied upon the advice of Dazey, Dazey knowing he was so doing, and, accordingly, went to Findlay in the evening of the same day, met Dazey at his, Dazey's, bank, the same being the First National Bank of Findlay, Illinois, Dazey being the cashier thereof, where, in the back room of such bank, a deed was prepared, executed and delivered to Dazey whereby Duncan conveyed to Dazey the land above described, without any consideration, but upon the trust and confidence by Duncan imposed in Dazey by reason of Dazey's advice given as above set forth; that at the time of the execution of said deed, there was also present, at the instance of Dazey, an attorney, Robert M. Peadro, which attorney also advised Duncan that the action he was then and there taking was in all respects regular and proper, and Duncan believed such advice; that acting upon Dazey's advice, Duncan then and there turned over to Dazey his, Duncan's, bank book, which had been issued to him by the First National Bank of Findlay; that Duncan has never received said bank book back, but about a year thereafter Dazey gave Duncan what purported to be a duplicate of such bank book; that still acting upon the advice and counsel of Dazey, Duncan at once left Shelby county for the purpose of avoiding service in said Graybill suit, and within a few weeks left the State of Illinois, still acting upon the advice and counsel of Dazey, and went to reside in St. Louis, Missouri.

That said Graybill suit was pending in the courts for several years, being finally disposed of in the summer of 1915, at which time Duncan settled the same and resumed his residence in Illinois and Shelby county,

he, upon advice and counsel of Dazey, having continued to reside without the State of Illinois up to that time; that Dazey advised Duncan that he should go even further away, and advised him to go to Argentine, proposing to pay his expenses, and by insinuations and otherwise warned Duncan that he might be arrested, and the only safe course was for Duncan to remain beyond the jurisdiction of the Illinois courts; that Duncan believes it was the design of Dazey to keep Duncan outside the State of Illinois so that Dazey might more easily defraud him out of his property; that Dazey induced Duncan to transfer his said property to Dazey with the intent and design to defraud Duncan out of the same; and that it was no purpose of Dazey to assist Duncan in contesting the payment of a debt which Duncan did not morally owe, and which he was advised by Dazey he did not legally owe.

That at the time of the transfer of said land there was a matured crop thereon of the value of $1,500 which Dazey took possession of and disposed of and received the proceeds therefrom; that Dazey received the rents from the land for the next year ensuing, of the value of $1,500.

That for a long period following the transactions aforesaid, Dazey recognized his trusteeship of said property, that Duncan was the real beneficial owner thereof, and for several years thereafter rendered unto Duncan accounts of his acts and doings as his agent in the premises.

That afterwards Dazey represented to Duncan that it was necessary to sell said land, because he was being harassed, and feared a creditor's bill might be filed and the property thus be reached to satisfy the Graybill claim; that on or about February 15, 1905, Dazey sold said land to one J. S. Fry; that Dazey represented to Duncan that he sold it for $16,000 over and above the incumbrance, but Duncan has since learned the sale was for $18,500 over and above the incumbrance, or,

if for less amount, it was had under a collusive arrangement of some sort between Dazey and Fry.

That at some time after the foregoing, Duncan's father died, and Duncan inherited a share of his father's real and personal estate; that the Graybill suit was still pending; that Duncan was still a resident of St. Louis, and was still acting upon and following the advice of Dazey; that as a result of such advice, to further defeat the Graybill suit, Duncan assigned Dazey his interest in his father's estate, under date of March 28, 1905, the same purporting to have been given to secure a note of $3,015, dated October 21, 1904, a note of $700 dated September 17, 1903, and an overdraft at the First National Bank of Findlay, of $1,465; that as a matter of fact there was no overdraft at said bank, no such note for $3,015, but was a note of $700 maturing about September 17, 1903; that on April 6, 1905, a judgment note for $3,015 was executed and delivered by Duncan to Dazey, being antedated to meet the description set forth in said assignment; that no consideration was given therefor; that thereafter, upon advice and counsel of Dazey, Duncan consented that said note of $3,015 be placed in judgment; that accordingly on April 7, 1905, Dazey placed said note in judgment in the Circuit Court of Shelby county, and an execution issued thereon; that said judgment is still in force and effect; that Dazey has recently claimed the right, notwithstanding his written acknowledgment to the contrary, to enforce said judgment, and has issued *scire facias* thereon; that the interests of Duncan require that Dazey be enjoined from prosecuting said *scire facias* pending the final determination of this cause; that upon advice and counsel of Dazey, Duncan executed a deed to one Herron, who was in all respects the agent and representative of Dazey, conveying Duncan's interest in his father's estate; that Dazey has received from Duncan's share of his father's real estate the sum of $1,453.43, and $600 from his father's per-

sonal estate, said sums having been so received about April 10, 1905.

That judgment was rendered against Duncan in the Graybill suit December 31, 1907, for $1,724.36, which was satisfied by Duncan in the summer of 1915; that during all these years Dazey has represented to Duncan that the Graybill suit was still pending and that Dazey could not settle with Duncan until said suit was finally ended; that Duncan has repeatedly requested a settlement with Dazey, and Dazey continually agreed to settle as soon as conditions would permit.

That upon .Duncan's leaving the State of Illinois, Dazey took charge of his bank account, and settled up Duncan's business affairs and debts, paying the same out of Duncan's money coming into Dazey's hands as aforesaid. Dazey issued checks in Duncan's name, on Duncan's bank account.

That Dazey continually played upon the unfounded fears of Duncan; led Duncan to believe he was in constant danger of arrest and requisition, and induced Duncan to believe it was of utmost importance to remain without the State of Illinois and secreted; that Dazey urged Duncan to go into bankruptcy, though there was no reason for such proceeding, but, as Duncan now believes, such was for the purpose of aiding Dazey in his design to defraud Duncan.

That Duncan purchased of Dazey, shortly before leaving the State of Illinois, two shares of the capital stock of the First National Bank of Findlay, Illinois; that said stock was never transferred on the stock books of the bank; that Dazey has collected the dividends on such stock, amounting to about $150, and that he should account for the same in addition to the other matters set forth.

That Duncan has received of Dazey out of the transactions above set forth the sum of $8,000, for which amount Dazey is entitled to credit upon accounting.

That at all times up until the summer of 1915, Dazey

represented to Duncan that he still owed Duncan, and would render a statement and settle, but kept continually putting Duncan off, upon some pretext or another, until in the summer of 1915, Dazey informed Duncan that he owed him nothing; that he had overpaid Duncan, all of which came as a surprise to Duncan; that until said statement by Dazey in the summer of 1915, that he owed Duncan nothing, Duncan retained full faith and trust in Dazey.

That Dazey has possession of the bank books, most of the checks and accounts and nearly all of the memoranda of Duncan concerning the property Duncan placed in Dazey's hands, and that therefore Duncan is unable to state the true account.

That throughout all the transactions above enumerated, Duncan was acting in good faith under the belief that he was following the proper and lawful course to protect himself from unjust and unlawful claims demanded of him; that he acted solely under the advice and direction of Dazey without any intent to hinder or delay his creditors contrary to law, and was not *in pari delicto* with Dazey.

That during the years of 1905, 1906 and 1907, the land described in the bill was held in the name of John S. Fry for the benefit of Dazey, and that Dazey should be required to account for the rents for these 3 years, which were of the value of $1,500 per year, in addition to the years of 1903 and 1904 as charged in the bill; that the alleged sale as set out in the bill to J. S. Fry by Dazey was fraudulent and fictitious; that Fry held said land for the benefit of Dazey, and that Fry sold the same to one John Boyle for Dazey's benefit on December 14, 1907, for $23,400; that the knowledge of such facts first came to Duncan from evidence produced in the hearing of this case; that Dazey should be required to account for said sum of $23,400, with prayer for relief as prayed in the bill, changed to meet the alteration in the allegations of fact, prays an ac-

counting with Dazey, and a cancellation of the judgment described, and offers to do equity to Dazey, as shall to the court seem meet.

In his answer as amended, Dazey, appellee, admits that he took title to the land and then categorically denies every other material allegation in the bill and avers that he has paid Duncan all the money owing to the latter and that Duncan is, in fact, indebted to him; that Duncan is not entitled to relief because he is estopped by the statute of limitations, by laches and the statute of frauds, and that he does not come into a court of equity with clean hands.

The cause was referred to a special master in chancery, who found that appellant conveyed and concealed his property for the purpose of hindering, delaying and defrauding his creditors; that appellant and appellee were *in pari delicto,* and recommended that the bill be dismissed for want of equity. Numerous objections were filed to the master's report by appellant, which were overruled and stood as exceptions thereto on the hearing before the chancellor. The exceptions were overruled and a decree entered dismissing the bill for want of equity. Appellee filed no objections or exceptions to the master's report.

MARTIN & PYLE, for appellant.

WHITAKER, WARD & PUGH, for appellee.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

The proofs in this case are very voluminous and no attempt will be made to enter into a lengthy discussion of the same. The master made no findings of law or fact upon the defenses of laches, the statute of limitations or the statute of frauds. Appellee filed no objections to the master's report, and these ques-

tions are not preserved for our consideration. *Shaffner v. Healy,* 57 Ill. App. 90; *Snell v. Deland,* 138 Ill. 55; *Cook v. Meyers,* 54 Ill. App. 590. The evidence shows beyond all reasonable doubt that the acts of appellant in the transactions involved were for the purpose of concealing his property so that it would not be subjected to the payment of the Graybill claim, and that appellee knew and understood that the conveyance of the lands and property by appellant to him was for this purpose. A voluntary conveyance of land in fraud of creditors, while void as to creditors, is binding upon the parties so far as it is executed, and neither law nor equity will lend its aid to complete any part of the transaction. *Beebe v. Saulter,* 87 Ill. 518; *McElroy v. Hiner,* 133 Ill. 156; *Brady v. Huber,* 197 Ill. 291; *Rosenbaum v. Huebner,* 277 Ill. 360.

If the proofs show that appellant and appellee were *in pari delicto* in an attempt to defeat the creditors of the former, then a court of equity will not lend its aid to preserve or carry out the trust. But it does not necessarily follow that when two parties commit an illegal act, that they are *in pari delicto.* The rule adopted in this State is as stated in 1 Story's Eq. Jur. sec. 300: "In cases where both parties are *in delicto* concerning an illegal act, it does not always follow that they stand *in pari delicto,* for there may be, and often are, different degrees in their guilt. One party may act under circumstances of oppression, impression, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense."

In the case of *Baehr v. Wolf,* 59 Ill. 470, the court said:

"One party may not make use of his peculiar power over another to procure a contract which, in itself, is illegal, and contrary to public policy, and then invoke the aid of the law to enable him to retain that which he has obtained through fraudulent practices and artifices.

It would contravene the settled law that the courts will protect the citizen against all such acts of oppression and deceit.''

The controlling question in this case is, were appellant and appellee *in pari delicto?* The proofs show that appellant, a number of years prior to September 22, 1903, was divorced by his first wife in a suit brought by her and, in the settlement of their property rights, appellant deeded to her what was known as the Shanholtzer farm. This farm, at that time, was incumbered by a mortgage given to secure the payment of promissory notes previously executed by appellant and his then wife, amounting in the aggregate to the sum of $3,000. The mortgage indebtedness his wife agreed to assume. It is stated by counsel for both appellant and appellee that the mortgage on this farm was subsequently foreclosed and a deficiency decree rendered for the sum of $1,000, though no such decree appears to have been introduced in evidence. The record does show, however, that a suit in assumpsit was instituted on August 18, 1903, in the Circuit Court of Shelby county by one Laura E. Graybill against appellant and his former wife to recover on a promissory note dated March 9, 1895, for the principal sum of $1,000, executed by appellant and his then wife, payable to the order of Amos Shanholtzer and assigned by the latter to Laura E. Graybill. In 1903, when this assumpsit suit was brought, appellant, who had married again, was a farmer about 57 years of age, and owned two farms in Shelby county. One farm consisted of 180 acres and was known as the Okaw farm. The other farm, known as the Flat Branch farm, was occupied by M. A. Duncan, a son by his first wife, and consisted of 140 acres. There was a mortgage indebtedness of about $4,000 on the Okaw farm. The market value of these farms at that time was between $90 and $125 per acre. It does not appear that appellant in September, 1903, had any other debts of any consequence

except the mortgage indebtedness on the Okaw farm of $4,000, and the Graybill note of $1,000. At this time, the crops were maturing on these farms and appellant had cut between 140 and 150 tons of hay, and also owned considerable personal property, consisting of horses, cattle, hogs, farm implements, etc. The value of the personal property, we have not been able to search out of the very voluminous record and have not been aided by counsel in regard thereto. The record does, however, show conclusively, and it is in no way disputed, that appellant in September, 1903, was perfectly solvent.

From the time that appellant was divorced from his first wife in 1895 until September, 1903, he had no knowledge that his former wife had failed to pay the notes secured by the mortgage on the Shanholtzer farm or that said mortgage had been foreclosed, and from the proofs it is evident that he labored under the belief that, since the decree for divorce was rendered, owing to the fact that he had deeded the Shanholtzer farm to his former wife and she had assumed the payment of the mortgage indebtedness thereon, he was discharged from any further liability for the payment of the same. In fact, his testimony tends to show that he is still convinced that some fraud has been practiced upon him in compelling him to pay the Graybill judgment. Appellant was a very ignorant man so far as education was concerned, as the following letter, one of several which were introduced in evidence, will show:

"McCoy's European Hotel and Cafe,
            Corner Clark & VanBuren Streets
                    Chicago            190
"Mr. J. E. Dazey, Esq.

Sir—I had a talk with E. S. McDonal when I got too Dicatur & he said He worked on Books untill About 6PM his Idea was two take Proceedings two Stay the Jugment & He Said thought the facks Could Be Shone

that the Note they was Souing on was Same as the One judgment was taken on.

So we could Nock them Out Law is fur Justic & it Looks as though Pedrow Ought two Feil Papers two get a hereing on case their Is Plain Evidence of Fraud In thiss Case Y I feel If Mr Pedrow takes the Proper steps He could Feile papers two Sustain A case.

I now I had a Judment in Christiar county on Plane Note of hand & Old Man Tailor twock Some King of proseedings two hav a New hering & the jugment was very Old. It is turning cool & from Indicasive their will Be Some Cheap Cattle.

In yards thiss weak I could hav Bought Some yesterdy 700 weight for 2¾ they had horns on the Dehorned Cattle Sell 35 sence per hund Higher.

Looks as though Some of these 2½ two I kuce Sheap. could Be Sold at a profit & some of theas fleshy hefers at 2 75 can Buy jansis Sanhill hefer In jansis Sity for 2¼ good Beef weghing fron 7 two 8 Hundred.''

In September, 1903, appellee was, and had been for a number of years, principal owner and cashier of the First National Bank at Findlay, Illinois; he is also a licensed attorney at law; he also dealt in stock and grain, more or less, and had joined with appellant in several transactions involving the buying and selling of live stock. While he testified that his relations with appellant were no different than with any other customer of his bank, the evidence conclusively shows that they were of a most intimate nature. In addition to the stock deals participated in by appellee and appellant, the proofs, including the correspondence between the parties, show that their relations had been of a most confidential character long before the transactions involved in this case occurred. There can be no question but that appellant trusted appellee implicitly in business matters and in his personal affairs, even to such an extent that he permitted appellee to draw checks on appellant's account at the bank and

to sign appellant's name thereto. There can also be no question that, for nearly 12 years following September, 1903, appellant's actions were practically absolutely controlled by appellee's directions and advice. With the relations thus existing between the parties as indicated, according to appellant's testimony, appellee called appellant into the bank between September 18th and September 22nd, and told him that Mrs. Graybill had brought a suit against him to recover $3,300 on account of the Shanholtzer notes; that it would be a long and expensive litigation and would ruin him and that, if appellant would deed the farm to him, he would get the claim settled and deed the farm back again to him; that appellee told him he should deed the Flat Branch farm to his son Aubrey; that when appellant protested that he did not want to sell his farm, appellee said that he would give him a bond to deed it back to him. Appellant went home and the next day procured a lawyer from Decatur by the name of McDonald, who came to Findlay to consult with him. McDonald and appellant and appellee had some conversations over the matter and appellant requested appellee and McDonald to go to Shelbyville and look over the papers and records and advise him as to his liability, that appellee drove with McDonald to Shelbyville in the former's buggy, and that when they got to Shelbyville he paid McDonald his fee and discharged him; that when appellee returned that afternoon from Shelbyville he told appellant, "I just let McDonald go home, we can fix it up"; that appellee also said that McDonald had found the Shanholtzer notes just as appellee had represented; that the sheriff had a subpoena against him and was liable to serve it on him at any time; that he should come and fix the papers as soon as possible or they would ruin him. That that evening appellant and his wife and Aubrey, his son, went to the bank; that when they ar-

rived at the bank, they found there appellee, Claude Laughlin (an employee of the bank) and R. M. Peadro, a lawyer living at Sullivan. A deed was prepared conveying the Okaw farm to appellee and the Flat Branch farm to Aubrey Duncan. These deeds were executed by appellant and his wife. Appellee also, at this time, executed a bond for a deed whereby he obligated himself to convey to appellant the Okaw farm upon the payment of $14,000 to be paid all cash on or before "April 1, 1904—1905—1906." Appellee also induced appellant to execute an affidavit stating that on September 21, 1903, he had sold to appellee this farm and received all the money due him on the same. This affidavit was not only sworn to before Laughlin, as a notary public, but also has attached to it a certificate of acknowledgment such as would be required to a deed. There is no pretext but what this affidavit was a fraud, or that any consideration whatever passed for the conveyance.

Appellee's version of the transaction is that appellant insisted on selling him the land in order to avoid the payment of the Graybill claim; that he did not take McDonald to Shelbyville and did not hire Peadro; that he met Duncan and his wife in the bank that evening and that Laughlin and Peadro were there. He states in his testimony, "There was not much said about the land at that time. The deed was prepared and signed, and that was about all there was to it. They were not there very long, 10, 15 or 20 minutes." He further testified: "In the talks Duncan asked more than $90.00 for the land and I finally offered $90.00, and he accepted it. His proposition was that he would take $90.00 and I was to pay him when I sold it. He was to have the crops off of it and he was to pay interest on the money I advanced to him. This was said before the deed was made." In explanation of the execution of the bond for the

reconveyance of the land, he stated that he executed the bond for the purpose of inducing appellant's wife to sign the deed. At this time, appellant had cut between 135 and 140 tons of clover and timothy hay, which was still on the farm, and there were 23 acres planted in corn and a few acres in oats. There was some old corn on the place, fifteen or eighteen head of cattle, five or six brood sows and several shoats, four horses and fourteen sheep. Appellant further testified that appellee told him he should immediately leave the State so that he could not be served with process. This is denied by appellee. Appellant further testified that he agreed with appellee that his wife should remain on the farm and run it with hired help until the Graybill claim was defeated and he could return. Appellant did not go home with his wife that night but went to the home of his son, Aubrey, and the next day started on a wandering journey which finally terminated at Tulsa, Oklahoma. He left Tulsa the following May and went to St. Louis, Missouri, where he remained until shortly before this suit was started.

The most favorable construction that can be placed upon the testimony of appellee is that he, a supposedly educated, intelligent business man, controlling the only bank in a small town, and thereby holding himself out to the community at large as one entirely worthy of confidence and trust, aided, assisted and encouraged an ignorant and illiterate man to convey to him 180 acres of land, worth at least $13,000 above the mortgage indebtedness thereon, to abandon his home and family and to become an exile from his State in order to defeat a claim of a little over $1,000. He even admits that he willingly aided in the commission of a fraud upon appellant's wife by executing a bond for a reconveyance, thereby inducing her to execute a deed under the false belief that he would hold the title of

the land but temporarily, when, in fact, he at the time intended to claim the deed as an actual conveyance of the title to him. It seems incredible that, even a man of appellant's limited intelligence, would, of his own volition, sacrifice so much to gain so little. If it be conceded that appellant's act in conveying the premises to appellee for the purpose of defeating the Graybill claim was unlawful, there is an extenuating circumstance in the fact that he believed, at the time, that the Graybill claim was one which he did not morally or lawfully owe and that its attempted collection was a scheme to deprive him of his property. In other words, he was not intending to defraud a legitimate creditor but to protect his property from what he considered to be a fraudulent claim. The evidence shows that he many times importuned appellee to get an attorney and to take other steps to fight the claim and that appellee led him to believe, during the whole period of the 12 years that he remained out of the State, that appellee was looking after his interests and would eventually defeat the Graybill suit. Letters written by appellee to appellant during this period show conclusively that appellee operated continually upon the fears of appellant and continually advised him to remain out of the State. He even implanted the fear of arrest on some mythical criminal charge if appellant should return to Illinois. On September 26, 1903, appellee wrote to appellant stating that he was down to the farm that morning, everything was O. K. and would keep him posted. On February 19, 1904, he wrote to appellant stating that he would look after things, that everything was all right, that he would go out to see him the next month, and closed, "Chafee (Mrs. Graybill's attorney) is yet mad, but I don't know just what he can do." On March 1, 1904, he wrote to appellant while the latter was at St. Louis, among other things, as follows: "I am real anxious

to see you, and, as soon as you get to St. Louis, send me a letter or message and I will go down at once. If you send a message sign it John Jones, just say 'am here at Bement Hotel.' " On March 9, 1904, appellee addressed a letter to appellant under the name of John Smith in which, among other things, he says: "I would sooner meet you in Decatur than in Sullivan, for you will see too many that know you there and it might cause some trouble." On October 26, 1904, in another letter he says: "You need not worry about that matter, I feel absolutely safe on it now. You need not be afraid of Mr. Peadro. Do not send any one to see the other fellows yet, leave that until later. I see no immediate cause for uneasiness and if there was any, I think I would know it." On April 29, 1905, he writes,. "Chafee has an execution out and sent it to Moweaqua." This statement was untrue. In a letter dated July 1, 1905, appellee writes to appellant, among other things, "I do not know what they have for you, but as soon as I get home I will look into this matter. It would be best to keep away from them. If you get arrested, fight the requisition papers and, if I am at home, I will come down. I will any way as soon as I get time. * * * Do your best to keep out of their way. It is easier to keep out than to get out after you get in." On July 25, 1905, he writes, "I have been trying to find out what they have for you, but so far have been unable to do so. But I have a man now that I think can find out from the sheriff." On June 3, 1906, in a letter to appellant, he uses this language, "When you write me use plain envelope, if you can. Chafee is storming around all the time." Although appellee was served with subpœna *duces tecum* and also with notice for the purpose of procuring the letters written by appellant to appellee, he, through his counsel, refused to produce any except three, one of which we have quoted in the former part of this opinion.

During appellant's ridiculous expatriation, he from time to time drew sums of money on appellee which were paid by the latter. On March 30, 1905, appellant's father died and appellee visited appellant at St. Louis with the result that appellant executed a written assignment of his interest in his father's estate to appellee and, at the same time, appellee procured from appellant a judgment note for $3,015, on which judgment was subsequently confessed. As a result of this conference, appellant also is induced to convey by deed his interest in the real estate owned by his father to one R. M. Herron, an employee in appellee's bank, with the understanding that Herron was to file a suit for the partition of said premises, which he did, and appellee succeeded in obtaining appellant's share in said estate amounting to the sum of $284.28 from the personal estate and $1,453.43 from the sale of the real estate in the partition suit. Appellee claims that he paid a note for $3,015 which appellant had given to the bank and that the judgment note for the like amount was executed by appellant to reimburse appellee for paying the note. Appellant denies that he ever gave any such note to the bank. Judgment was thereafter confessed against appellant in favor of appellee on this note.

On Sunday, June 18, 1905, Duncan went to Shelbyville, Illinois, and was served with summons in the Graybill suit and subsequently judgment was rendered against him in that case. Appellee in November, 1905, in a letter to appellant stated that he had had the service quashed because it had been made on Sunday, which was, in fact, untrue and the service was sustained. In 1914, while appellant was still living in St. Louis, his brother died leaving him more property. The Graybill judgment was made out of this property.

On March 30, 1905, appellee conveyed the Okaw farm to one Fry for $16,020. On December 14, 1907, Fry conveyed the land to one John Boyle for $23,400,

No attempt has been made to mention all the facts appearing in the very large record in this case, but enough has been set out to show the extraordinary influence appellee exercised over appellant. As stated in the outset of this opinion, the controlling question in the case is whether appellant and appellee were *in pari delicto*. Our conclusion, from the manifest weight of the testimony in this case, is, that appellee's contention that, in the fraudulent transactions between himself and appellant for the purpose of defrauding the latter's creditors, appellant was equally guilty with himself and therefore *in pari delicto,* cannot be sustained. Appellee had the master mind and exercised an inexplicable influence over that of appellant. He actually succeeded in procuring not only appellant's original farm but the property he inherited from his father, and in keeping appellant out of the State for 12 years, through the fear of ruination and arrest. Appellant followed appellee's advice during all that period of time absolutely and unquestionably, and the relations between these parties could not have been more confidential if they had been between attorney and client. In the case of *Herrick v. Lynch,* 150 Ill. 283, the court said:

"We do not think, however, that under the circumstances there should be an application of that rule of equity which denies relief to one party against another when both have been engaged in a fraudulent transaction. The parties were not *in pari delicto*. One was legal adviser, the other client. The advice of the former being adopted, he procured title to the latter's interest in valuable real estate. Equity will not tolerate the idea that an attorney may make use of his peculiar power over his client to procure a contract which is illegal and contrary to public policy, and to then invoke the aid of the law to enable him to retain that which he has obtained through his fraudulent artifices. 1 Story's Eq. Jur. sec. 300; *Baehr v. Wolf,* 59 Ill. 474."

If the parties are not *in pari delicto,* equity will give relief to the one that is comparatively innocent. *Woodall v. Peden,* 274 Ill. 301; *Brady v. Huber,* 197 Ill. 291.

The decree is reversed and the cause remanded with directions to enter an order referring this case to the master in chancery, with directions to state an account between the parties.

The original exhibits certified to this court are hereby ordered to be returned to the clerk of the Circuit Court of Shelby county.

*Reversed and remanded with directions.*